**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jane Doe (G.N.C.), | CIVIL ACTION NO: 1:23-cv-07980-PKC |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT** |
| Uniquest Hospitality LLC, Brookwood Hospitality LLC, Hilton Franchise Holding LLC, Vornado Realty Trust, Vornado Realty L.P., 401 Hotel TRS LLC, Jai Bhole, Inc., and Rudra MGMT Inc., | **JURY TRIAL DEMANDED** |
| Defendants | |

COMES NOW Plaintiff Jane Doe (G.N.C.), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## SUMMARY

1.    Jane Doe (G.N.C.) (hereinafter "Plaintiff" or "Jane Doe (G.N.C.)") files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in hotels owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.    Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

1

3.      Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.      As discussed herein, each Defendant, individually and collectively, derived financial benefits from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (G.N.C.), with minimal risk of detection or interruption.

8.      In this case, Each Defendant developed a continuous business relationship with sex traffickers, including Jane Doe T.R.S.'s trafficker, by providing these traffickers with hotel rooms and related services despite apparent "red flags" that blatantly alerted Defendants to sex trafficking

---

[2] 18 U.S.C. §1591(e)(3).

occurring at the subject location. Defendants were, therefore, knowingly receiving a benefit from participation in a venture with traffickers that each Defendant knew or should have known was facilitating sex trafficking, including the trafficking of Jane Doe (G.N.C.).

9.     Each Defendant also participated in a commercial venture with the other Defendants operating their respective hotels. Each Defendant continued participating in this venture even though it knew or should have known that the hotel was facilitating widespread sex trafficking, including the trafficking of Jane Doe (G.N.C.).

10.     Defendants had the knowledge and opportunity to cease benefiting from the severe and permanent harm that Jane Doe (G.N.C.). experienced as the result of the trafficking she endured in Defendants' hotels. Defendants failed to do so. Instead, Defendants chose to benefit from the facilitation of sex trafficking.

## PARTIES

11.     Jane Doe (G.N.C.) is a natural person who is a victim of sex trafficking within the meaning of 18 U.S.C. §§1591 and 1595(a).

## I.     Embassy Suites Buffalo Defendants

12.     Defendant Uniquest Hospitality LLC ("Uniquest") is a for-profit limited liability company incorporated under the laws of the State of New York with its principal place of business at 100 Corporate Parkway, Suite 500, Amherst, NY 14226.

13.     At all relevant times, Uniquest owned, operated, controlled, and/or managed the Embassy Suites hotel located at 200 Delaware Ave, Buffalo, NY 14202 ("Embassy Suites Buffalo") and entered into a franchising agreement to operate the property as an Embassy Suites branded property.

14.    Defendant Brookwood Hospitality, LLC ("Brookwood") is a for-profit limited liability company incorporated under the laws of the State of New York with its principal place of business at 57 Brook Court, East Amherst, NY 14051.

15.    Upon information and belief, Brookwood entered an agreement with Uniquest to provide management services at the Embassy Suites Buffalo under the Embassy Suites franchising system.

16.    Upon information and belief, at all relevant times, Brookwood provided management services at the Embassy Suites Buffalo under the Embassy Suites franchising system.

17.    Uniquest and Brookwood are referred to collectively as the "ES Franchisee Defendants."

18.    Defendant Hilton Franchise Holding LLC ("Hilton Franchise") is a limited liability company incorporated under the laws of the State of Delaware with its principal place of business at 7930 Jones Branch Drive, Suite 1100, McLean, Virginia 22102.  According to a declaration signed by Owen Wilcox, Senior Vice President and Assistant Secretary for Hilton Worldwide Holdings, Inc., Embassy Suites Franchising, LLC is no longer an active Hilton entity, and all of its rights and obligations were passed to Hilton Franchise Holding, LLC.

19.    Upon information and belief, at all relevant times, Hilton Franchise Holding, LLC and its predecessors in interest directly and through their affiliates, owned, operated, controlled, managed, licensed, leased, and/or provided various services to Embassy Suites hotels, including the Embassy Suites Buffalo.

20.    Upon information and belief, at all relevant times Embassy Suites Franchise, LLC, a Hilton affiliate and predecessor in interest to Hilton Franchise Holding, LLC, acting directly and

through affiliates, adopted a centralized approach to exercising control over Hilton properties, including Embassy Suites properties.

21.     Upon information and belief, the Embassy Suites Franchise, LLC, predecessor in interest to Hilton Franchise Holding, acted to operate, manage, supervise, and control the Embassy Suites Buffalo.

22.     Hilton Franchise Holding, LLC, as successor in interest of Embassy Suites Franchise, LLC, is referred to as "ES Brand Defendant."

## II.     Hotel Pennsylvania Defendants

23.     Defendant Vornado Realty Trust ("Vornado Realty Trust") is a for-profit corporation incorporated under the laws of the State of Maryland with its principal place of business at 888 Seventh Avenue, New York, New York 10019.

24.     Defendant Vornado Realty L.P. is a for-profit limited partnership incorporated under the laws of the State of Delaware with its principal place of business at 888 Seventh Avenue, New York, New York 10019, and at all relevant times, was a subsidiary of Vornado Realty Trust.

25.     Defendant 401 Hotel TRS LLC, is a for-profit limited liability company incorporated under the laws of the State of Delaware with its principal place of business in New York, New York, and at all relevant times, was a subsidiary of Vornado Realty Trust.

26.     Upon information and belief, 401 Hotel TRS LLC is a successor to 401 Hotel TRS, Inc. and is liable for its acts and omissions giving rise to this lawsuit. All references to 401 Hotel TRS, LLC, include references to its predecessor.

27.     Upon information and belief, at all relevant times, Defendants Vornado Realty Trust, Vornado Realty L.P., and 401 Hotel TRS LLC, acted individually and collectively to own, operate, control, manage, and supervise the Hotel Pennsylvania, which was located at 401 Seventh

Avenue, New York, New York 10001. These Defendants will be referred to collectively as the "Hotel Pennsylvania Defendants."

### III. Boulevard Inn Defendants

28.     Defendant Jai Bhole, Inc. ("Jai Bhole, Inc.") is a for-profit corporation incorporated under the laws of the State of New York with its principal place of business in Fredonia, New York.

29.     Upon information and belief, at all relevant times, Jai Bhole, Inc. owned, operated, managed, controlled, and/or supervised the Boulevard Inn located at 785 Niagara Falls Blvd, Amherst, NY 14226 ("Boulevard Inn").

30.     Defendant Rudra MGMT, Inc. ("Rudra Management") is a for-profit corporation incorporated under the laws of the State of New York with its principal place of business in Cheektowaga, New York.

31.     Upon information and belief, at all relevant times, Rudra Management owned, operated, managed, controlled, and/or supervised the Boulevard Inn.

32.     Upon information and belief, at all relevant times, Jai Bhole, Inc. and Rudra Management acted individually and collectively to own, operate, manage, control, and/or supervise the Boulevard Inn. Jai Bhole, Inc. and Rudra Management will be referred to collectively as the "Boulevard Inn Defendants."

<u>**JURISDICTION AND VENUE**</u>

33.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Southern District of New York and all Defendants are residents of New York.

35.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims, including a substantial part of the trafficking endured by Plaintiff as alleged herein, occurred in the Southern District of New York.

## FACTS

36.     Jane Doe (G.N.C.) was a victim of unlawful sex trafficking at hotels owned, operated, managed, controlled, and supervised by Defendants.

37.     At the age of 20, Jane Doe (G.N.C.) met her first trafficker through a friend. The trafficker manipulated her through developing a relationship and then becoming abusive. The trafficker posted Jane Doe (G.N.C.) online without telling her and used coercion and violence to cause her to perform commercial sex services for his financial benefit. Another trafficker subsequently took over control of Jane Doe (G.N.C.). To control Jane Doe (G.N.C.), these traffickers beat her, cut off her hair, locked her in rooms for multi-day periods, raped her, controlled her with drugs, and tortured her.

38.     Jane was trafficked during a period from at least September 2013 to 2017.

39.     Jane Doe (G.N.C.)'s traffickers moved her between hotels in the New York area, coercing her to perform commercial sex services for their benefit. Jane Doe (G.N.C.)'s sexual exploitation occurred at hotels owned, operated, managed, controlled, and supervised by Defendants, and each of the Defendants participated in a venture that facilitated this trafficking.

40.     Between September 2013 and November 2013, Jane Doe (G.N.C.) was repeatedly and regularly trafficked at the Embassy Suites Buffalo.

41.     On multiple occasions in or around November 2016, Jane Doe (G.N.C.) was trafficked at the Hotel Pennsylvania.

42.     During this trafficking period, Jane Doe (G.N.C.) was trafficked many times at the Boulevard Inn, which was one of the primary locations used by her trafficker. The period during which Jane Doe (G.N.C.) was trafficked at this hotel includes but is not limited to repeated incidents of trafficking in early 2017.

43.     While in these hotels, Jane Doe (G.N.C.) would be forced to see as many as 15 "johns" per day.

44.     Jane Doe (G.N.C.)'s trafficking had profound effects on her, consistent with well-recognized "red flags" of trafficking in the hospitality industry, that were obvious and apparent to the staff and management of Defendants' hotels, including effects on her appearance, demeanor, movements throughout the hotel, and interactions with others. This included visible signs of the violence repeatedly inflicted on Jane Doe (G.N.C.), effects from coerced use of drugs, apparent signs of fear, and other signs that provided notice that she was being continually subjected to violence, coercion, control, and exploitation. At all times, while in Defendants' hotels Jane Doe (G.N.C.) displayed blatant "red flags", readily apparent to Defendants' hotel staff that she was being subjected to physical and psychological abuse and to other forms of coercion.

I.     **The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem**

45.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what each of the Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of Jane Doe (G.N.C.).

46.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[3] For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[4] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[5] Hotels have been found to account for over 90% of commercial exploitation of children.[6]

47.    The New York Attorney General has recognized that traffickers rely on the hospitality industry for moving, controlling, and delivering victims of commercial sex or forced labor and that, as a result, hotels have an obligation to report, respond to, and prevent human trafficking.[7]

48.    Because of this link between hotels and sex trafficking, government agencies and nonprofits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

49.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, National Center for Missing and Exploited

---

[3] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[4] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry/; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), https://www.huffpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victims-life_n_57714091e4b0f168323a1ed7

[5] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://ecommons.cornell.edu/bitstream/handle/1813/71224/Sarkisian_2015_Human_trafficking.pdf?sequence=1&is Allowed=y

[6] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013), https://nyujilp.org/wp-content/uploads/2010/06/46.1-George.pdf

[7] https://wutv29.com/news/local/nys-ag-reminds-hotels-of-obligation-to-help-human-trafficking-victims-as-travel-increases

Children, Polaris Project, Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

50.    Widely recognized signs of sex trafficking, which can be observed by hotel staff and which Defendants were made of aware of, include but are not limited to:[9]

a. Individuals showing signs of fear, anxiety, tension, submission, and/or nervousness;

b. Individuals showing signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e. Individuals lacking freedom of movement or are constantly monitored;

f. Individuals avoiding eye contact and interaction with others;

g. Individuals with have no control over or possession of money or ID;

h. Individuals dressing inappropriately for their age or have lower quality clothing compared to others in their party;

i. Individuals with few or no personal items—such as no luggage or other bags;

j. Individuals appearing to be with a significantly older "boyfriend" or in the company of older males;

k. A group of girls that appear to be traveling with an older female or male;

l. A group of males or females with identical tattoos in similar locations, which may indicate "branding" by a trafficker;

---

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking,   https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors; Love 146, *Red Flags for Hotel & Motel Employees*,
https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf
Texas Attorney General, Human Trafficking Red Flags,
https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf
[9] *See Id.*

m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.  Possession or use of multiple cell phones; and

p.  Possession or use of large amounts of cash or pre-paid cards.

51.    Other commonly recurring signs of sex trafficking at a hotel include use of cash or a prepaid card to pay for a room, refusal of housekeeping services for multiple days, requesting housekeeping services (such as new linens or sheets) but refusing hotel staff access to the room, frequent use of a "Do Not Disturb" sign, finding large amounts of cash or sex paraphernalia in a room, the smell of bodily fluids or musk, the same person reserving multiple rooms, unusual traffic patterns to and from a room, individuals loitering in hallways or common areas who appear to be monitoring the area, evidence of illegal drugs or excessive alcohol use, excessive use of hotel computers for adult-oriented websites, cars in parking lots are parked so license plate is not visible, presence of multiple cellphones or computers, and an extended stay booked without significant personal possessions in the hotel.[10]

52.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by properly trained staff and by tools that Defendants had in place to monitor their hotels.

53.    The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion. It

---

[10] / Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.; www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf

is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator:  the exchange of sex for money.

54.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[11]

55.     In 2013, the State of New York implemented a Human Trafficking Intervention Court because "there was a recognition that most of the people engaged in commercial sex work are not involved voluntarily."[12]

56.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

57.     Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[13] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

58.     There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified

---

[11] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf;
*Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship
[12] https://www.wbfo.org/local/2018-08-09/western-new-york-no-stranger-to-human-trafficking
[13] Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo identification at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.[14]

59.     The most effective weapon against sexual exploitation and human trafficking is education and training.[15]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[16]

60.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[17]  In reference to companies like Defendants,

---

[14]https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf

[15] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/

[16] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training
*See also* Carolin L, Lindsay A, Victor W (2015) Sex Trafficking in the Tourism Industry. J Tourism Hospit 4:166, https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-12172.html

[17] AHLA, *Free Online Training*, https://web.archive.org/web/20230521143805/https://www.ahla.com/issues/human-trafficking

ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

61.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

62.     Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

63.     Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (G.N.C.)'s trafficking, that sex trafficking was ongoing and widespread at the Defendant's hotel(s).

64.     Defendants have made the choice, at all levels, not to take appropriate action in response to their knowledge regarding sex trafficking in their hotels. Instead, Defendants have actively chosen to continue to benefit from sex trafficking of victims like Jane Doe (G.N.C.).

## II.     The TVPRA violations at the Embassy Suites Buffalo.

65.     The ES Franchisee Defendants and the ES Brand Defendant (collectively "ES Defendants") benefited from the rental of the rooms that were used to sexually exploit victims, including Jane Doe (G.N.C.). The ES Defendants knew or should have known they were

facilitating sex trafficking at the Embassy Suites Buffalo, including the trafficking of Jane Doe (G.N.C.).

66.    At all relevant times, ES Franchisee Defendants owned and managed the Embassy Suites Buffalo.

67.    At all relevant times, the ES Brand Defendant was directly involved in relevant operations at the Embassy Suites Buffalo, including directly participating in renting rooms at this hotel property and directly controlling aspects of hotel operations directly related to the claims of Jane Doe (G.N.C.) including but not limited to: policies and procedures regarding hotel security, policies and procedures regarding identification requirements and payment method requirements, policies and procedures regarding response to signs of human trafficking, training of hotel staff, and requirements for hotel staff to report suspicions of criminal activity.

68.    The ES Brand Defendant also exercised systematic control over ES Franchisee, including its day-to-day operation of the Embassy Suites Buffalo, including aspects of the operations of the Embassy Suites Buffalo directly related to the claims of Jane Doe P.B., such as: policies and procedures regarding hotel security, policies and procedures regarding identification requirements and payment method requirements, policies and procedures regarding response to signs of human trafficking, training of hotel staff, and requirements for hotel staff to report suspicions of criminal activity.

### A. The ES Defendants' Knowledge of Sex Trafficking

69.    The ES Defendants have known, since well before Jane Doe (G.N.C.)'s trafficking, that there was widespread sex trafficking at Hilton branded hotels, including the Embassy Suites Buffalo.

> *1) Sex Trafficking Has Long Been Prevalent at Hilton Properties, and the ES Defendants have known it.*

70.     Upon information and belief, at all relevant times the ES Brand Defendant has, acting directly and through affiliates, adopted a centralized approach to exercising control over Hilton branded properties, including Embassy Suites properties. This extends to the hotels' approach to human trafficking. For example, Hilton publishes a single human rights policy that covers all brands, annually prepares a single corporate responsibility report addressing human rights issues, and tracks markers related to its human trafficking response across all brands under the Hilton umbrella. This has also included maintaining centralized policies on detecting and response to trafficking, exercising centralized control over training related to sex trafficking, and adopting centralized practices for reporting of suspected trafficking both internally and to law enforcement.

71.     Sex trafficking was prevalent at Hilton branded properties, including Embassy Suites properties, both on a national scale and specifically in the State of New York.

72.     Public statements confirm that the ES Defendants were aware of the issue of sex trafficking in Hilton branded properties, including Embassy Suites properties:

   a.  As early as 2010, Chinese police found a brothel operating inside a Hilton branded hotel, which prompted Hilton Worldwide officials to publicly claim to be working on a code of conduct to prevent child sex trafficking at their branded properties. [18]

   b.  Hilton Worldwide, on behalf of its brands including Embassy Suites, joined the ECPAT-USA Code in 2011, acknowledging its duties to prevent and protect children from trafficking after over a year of advocacy directed at Hilton branded properties from anti-trafficking advocates.[19]

   c.  Speaking on behalf of its brands, including Embassy Suites, Hilton Worldwide stated in 2013: "Sex trafficking and sexual tourism is a large and growing problem worldwide, and Hilton Worldwide must never allow any of its properties, products,

---

[18] https://www.nasdaq.com/articles/hilton-working-abolish-child-sex-trafficking-2010-11-03
[19] https://stopchildlabor.org/hilton-signs-code-of-conduct-to-prevent-child-prostitution/

or services to be used in any manner that supports or enables any form of abuse and exploitation."[20]

    d.  In 2015, Hilton Worldwide conducted a global human rights assessment for all its branded properties, including Embassy Suites, that identified the following risk: hotels may be used by criminals to traffic victims for exploitation.[21]

73.    Public information, including scores of news stories and online reviews, confirms both the widespread sex trafficking problem at Hilton branded hotels and the ES Defendants' knowledge of this sex trafficking. Upon information and belief, the ES Defendants monitored both news stories and online reviews for indicia of criminal activity, including sex trafficking.

74.    Examples of notable press involving the frequent use of Hilton branded hotels for illegal activity, including sex trafficking, include:

    a.  In 2011, a man was convicted of sex trafficking a minor at a Hilton branded hotel in Minnesota.[22]

    b.  In 2011, a prostitute was raped when two men forced their way into her room at a Hilton branded property in New Hampshire.

    c.  In 2012, a man was charged with sex trafficking at another Hilton branded hotel in Minnesota.[23]

    d.  In 2012, a couple was charged with sex trafficking an 18-year-old girl with Autism Spectrum Disorder at a Hilton branded property.[24]

    e.  In 2012, a man was charged with forced labor and sex trafficking following a sting at a Hilton branded hotel in California.[25]

    f.  In 2012, arrests were made after police conducted a prostitution sting operation at a Hilton branded property in Memphis.[26]

---

[20] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013

[21] https://esg.hilton.com/wp-content/uploads/sites/3/2022/08/Hilton-FY-2021-Modern-Slavery-Act-Statement-1.pdf

[22] https://www.startribune.com/28-years-for-man-who-used-girl-for-prostitution/118163089/

[23] https://www.startribune.com/fridley-man-st-paul-woman-accused-of-prostituting-iowa-teen/138615249/

[24] https://www.twincities.com/2012/02/01/couple-charged-with-prostituting-runaway-iowa-girl-with-asperger-syndrome/

[25] https://www.nbclosangeles.com/news/local/long-beach-roshaun-kevin-nakia-porter-accused-human-trafficking-orange-county-pimp/1951757/

[26] https://www.actionnews5.com/story/20142585/suspected-prostitutes-busted-at-beale-area-hotel/

     g.   In 2013, an arrest was made in a prostitution sting at an Embassy Suites hotel in California.[27]

     h.   In 2016, a man was arrested at an Embassy Suites hotel in California on charges of attempted commercial sexual abuse of a minor.[28]

     i.   In 2017, a man was arrest for promoting prostitution at an Embassy Suites hotel in North Carolina.[29]

75.    These articles are just examples. There are many similar articles about sex trafficking and other associated criminal activity at Hilton branded hotels.

76.    Examples of online reviews confirming the widespread presence of sex trafficking, prostitution, and related criminal activity at Hilton branded hotels, including those in New York State, include:

     a.   A 2009 review of a Hilton branded property in New York noted that the hotel bar was used by prostitutes to pick up guests, that this could be spotted from a mile off, and that the hotel staff allowed it.[30]

     b.   A 2010 reviewer corroborated earlier reviews about prostitutes using the hotel bar at a New York Hilton hotel to pick up johns and said that hotel staff did not seem to care.[31]

     c.   A 2011 reviewer noted that prostitutes were permitted to engage in obvious solicitation activities at a New York Hilton branded hotel and noted that the activity was so obvious that the hotel must turn a blind eye to it.[32]

     d.   A 2012 review of a Hilton property in California stated "need i mention the prostitutes there on a daily basis. do not waste your money."[33]

---

[27] https://www.latimes.com/socal/glendale-news-press/news/tn-gnp-woman-arrested-at-glendale-hotel-in-prostitution-sting-20130703-story.html

[28] https://sfist.com/2016/12/28/facebook-owned_oculus_engineer_bust/

[29] https://www.fayobserver.com/story/news/crime/2017/02/06/woman-taken-to-embassy-suites/22086683007/

[30] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html

[31] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html

[32] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html

[33] https://www.yelp.com/biz/doubletree-by-hilton-hotel-san-jose-san-jose?adjust_creative=mapquest&start=40&utm_campaign=yelp_feed&utm_medium=feed_v2&utm_source=mapquest

e.  A 2013 review from a Hilton property in New York stated that prostitution activity in the hotel bar was so obvious that the hotel "must endorse it."[34]

f.  A 2013 review of an Embassy Suites in Silicon Valley noted that rates for commercial sex were being negotiated publicly in the hotel.[35]

g.  A 2013 review of a Hilton property in California noted that a" hooker and her "John" were having an audible conversation in a public area of the hotel.[36]

h.  A 2014 review of a Hilton property in Illinois stated "now it seems that the clientele there is mainly hookers and people who are partying."[37]

i.  A 2015 review of an Embassy Suites in Silicon Valley reported that police on the premises had arrested several prostitutes and were looking for the pimp who had been circling them in the parking lot.[38]

j.  A 2019 review from a Hilton property in Westbury, New York reported that it seemed "like a prostitute hotel" and there was obvious prostitution activity occurring in the adjacent room throughout the night.[39]

77.    These reviews are just examples. There are many similar reviews for Hilton branded hotels, both in New York and around the country.

78.    This sampling of news stories, reviews, and other public and non-public sources of information establishes that sex trafficking was widespread at Hilton branded properties, including Embassy Suites properties, and that the ES Defendants knew or should have known that:

a.  There was widespread and ongoing sex trafficking occurring at their branded properties.

b.  Sex trafficking was a brand-wide problem for Hilton originating from corporate level decisions.

---

[34] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html

[35] https://www.tripadvisor.com/Hotel_Review-g32717-d78235-Reviews-Embassy_Suites_by_Hilton_Milpitas_Silicon_Valley-Milpitas_California.html

[36] https://www.yelp.com/biz/hilton-sacramento-arden-west-sacramento?start=180

[37] https://www.yelp.com/biz/hampton-inn-chicago-midway-airport-bedford-park

[38] https://www.yelp.com/biz/embassy-suites-by-hilton-milpitas-silicon-valley-milpitas

[39] https://www.yelp.com/biz/hilton-garden-inn-westbury-westbury

    c.   Sex trafficking was a concern, specifically, in New York area hotels.

    d.   Hilton brand franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

    e.   The ES Brand Defendant's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

    f.   The ES Brand Defendant and ES Franchisee Defendants were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

79.    Despite the continually mounting evidence that sex trafficking at its properties was ongoing and growing, the ES Defendants continued to earn revenue through conduct that they knew or should have known would continue to facilitate that trafficking.

*2) The ES Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Embassy Suites Buffalo.*

80.    The ES Brand Defendant and ES Franchisee Defendants knew or should have known that sex trafficking was widespread and ongoing at the Embassy Suites Buffalo. Upon information and belief, traffickers, including Jane Doe (G.N.C.)'s trafficker, repeatedly chose to use the Embassy Suites Buffalo, such that there was a population of traffickers who operated at this hotel. They selected this hotel because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. There were obvious and apparent signs of this widespread trafficking activity, consistent with the well-known "red flags" of sex trafficking in the hospitality industry, that the ES Defendants knew or should have known about.

81.    Based upon information and belief, the traffickers, including Jane Doe (G.N.C.)'s trafficker, operated at the Embassy Suites Buffalo with little regard for concealment, due to an implicit understanding between the hotel staff of the Embassy Suites Buffalo and the traffickers.

This understanding enabled the traffickers to operate efficiently, as they had found a venue where they could conduct their operations without disruption from Defendants.

82.    Upon information and belief, and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Embassy Suites Buffalo, by multiple traffickers, who exhibited "red flags" of sex trafficking, that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, refusing room cleaning services, and other signs consistent with the "red flags" of trafficking identified above.

83.    Upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of the victims, as well as the nature of the victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

84.    All knowledge from the hotel staff at the Embassy Suites Buffalo is imputed to the ES Franchisee Defendants. The ES Franchisee Defendants knew about this widespread and ongoing trafficking at the Embassy Suites Buffalo, including the trafficking of Jane Doe (G.N.C.), through the direct observations of hotel staff, including management-level staff, and information otherwise communicated to the staff by other staff members, guests, and other sources.

85.    Upon information and belief, in addition to available public sources of information about trafficking, the ES Franchisee Defendants knew or should have known about the widespread trafficking at the Embassy Suites Buffalo based on non-public sources of information including but not limited to:

    a.    Direct observation of hotel staff and management;

    b.    Surveillance of the property;

    c.   Customer complaints;

    d.   Monitoring of online reviews and other customer feedback;

    e.   Information received from law enforcement; and

    f.   Other sources of non-public information available to the ES Franchisee Defendants.

86.    Upon information and belief, in addition to public source of information about trafficking, the ES Brand Defendant knew or should have known about the widespread trafficking at Embassy Suites properties, including the Embassy Suites Buffalo, based on non-public sources of information including but not limited to:

    a.   The obligation of hotel staff and hotel management to report suspected trafficking activity to the ES Brand Defendant;

    b.   The ES Brand Defendant's practice of monitoring patterns in reports of criminal activity (including trafficking) and assessing areas and properties at elevated risk;

    c.   The ES Brand Defendant's regular monitoring of online reviews;

    d.   The ES Brand Defendant's collection and monitoring of customer surveys and complaints;

    e.   The ES Brand Defendant's regular inspections of the hotel property;

    f.   The ES Brand Defendant's collection and review of surveillance of the hotel property;

    g.   Information obtained by "field-based associates" employed by the ES Brand Defendant that visited hotels to discuss human trafficking issues;

    h.   Information provided to the ES Brand Defendant by law enforcement; and

    i.   Other sources of non-public information available to the ES Brand Defendant.

87.    Upon information and belief, the ES Brand Defendants adopted a protocol that facially required hotel staff and franchisees to report suspected criminal activity, including sex trafficking to the ES Brand Defendant. Based on the existence of this protocol and the widespread and obvious trafficking at the Embassy Suites Buffalo, there were multiple instances of suspected sex trafficking that the ES Franchisee Defendants and their hotel staff and management were

required to, and upon information and belief did report  such trafficking to the ES Brand Defendants.

88.     Despite their knowledge, Defendants continued for years to facilitate human sex trafficking and other related illegal activity in its hotels that was obvious even to its customers. Local online reviews include:

    a.  A 2014 review for the Embassy Suites Buffalo entitled "violence in the hallway" noted dozens of people fighting in the hallway outside the guest's room leading to zones of arrests.[40]

    b.  The individual who responded to this was the Assistant General Manager/ HR Manager who had a Hilton.com email address and stated "we regret our mismanagement of the incident outside your guestroom."[41]

    c.  A 2015 review for the Embassy Suites Buffalo noted prostitutes visibly entering and exiting the hotel on several nights.[42]

    d.  A 2018 review at the Embassy Suites Buffalo noted audible violence in the hotel room next to the reviewer.[43]

89.     The ES Defendants had constructive knowledge of the widespread and ongoing trafficking at the Embassy Suites Buffalo because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

*3) The ES Defendants knew Jane Doe (G.N.C.) was being trafficked at the Embassy Suites Buffalo because of the apparent and obvious "red flags" of sex trafficking.*

90.     During the period that Jane Doe (G.N.C.) was trafficked at Embassy Suites Buffalo, there were obvious signs, observed by hotel staff, that her trafficker was engaged in sex trafficking:

    a.  The trafficker would often call and reserve a room in Jane Doe (G.N.C.)'s name.

    b.  The hotel rooms in which she was trafficked were frequently paid for with prepaid cards.

---

[40] https://www.tripadvisor.com/Hotel_Review-g60974-d1484384-Reviews-Embassy_Suites_by_Hilton_Buffalo-Buffalo_New_York.html

[41] *Id.*

[42] https://www.yelp.com/biz/embassy-suites-by-hilton-buffalo-buffalo?start=40

[43] https://www.expedia.com/Buffalo-Hotels-Embassy-Suites-Buffalo.h2607052.Hotel-Reviews

c.  Even though Jane Doe (G.N.C.) would stay for extended periods, her trafficker would not allow housekeeping to enter the room where Jane Doe (G.N.C.) was being exploited. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services.

d.  Jane Doe (G.N.C.) would request extra linens and towels but would exchange them at the door.

e.  The trafficker was often present with Jane Doe (G.N.C.) at check in and would linger around the hotel or in the parking lot while she was with a john.

f.  Other victims were being trafficked at the hotel.

g.  Jane Doe (G.N.C.)'s demeanor and appearance reflected her fear of her trafficker and the control he was exercising over her.

h.  Jane Doe (G.N.C.)'s trafficker limited her ability to communicate with hotel staff, such that it was obvious and apparent she was being subjected to coercion and control.

i.  There was heavy foot traffic in and out of Jane Doe (G.N.C.)'s room involving men who were not hotel guests.

j.  Jane Doe (G.N.C.)'s trafficker would force her to enter public areas of the hotel in inappropriate clothing, including lingerie. She would be forced to go down to the hotel lobby in lingerie to meet johns and bring them up to her room.

k.  Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel, including but not limited to those described above.

91.     Upon information and belief, multiple employees at the Embassy Suites Buffalo, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment. Based on this and on the other methods listed above, that they used to monitor and supervise the Embassy Suites Buffalo, the ES Franchisee Defendants knew or were willfully blind to the fact that Jane Doe (G.N.C.) was being trafficked at the Embassy Suites Buffalo.

92.    Given these obvious signs, the ES Brand Defendant knew or should have known about the trafficking of Jane Doe (G.N.C.) based on their policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking to the ES Brand Defendant.

93.    The ES Brand Defendant also knew or should have known about Jane Doe (G.N.C.)'s trafficking based on the other methods, listed above, that they used to monitor and supervise the Embassy Suites Buffalo.

94.    The ES Defendants had constructive knowledge of the trafficking of Jane Doe (G.N.C.) at the Embassy Suites Buffalo because her trafficking was the direct result of each Defendant's facilitation of trafficking at that hotel. Had they acted with ordinary diligence, they would have been aware of this trafficking and that they were benefiting from such trafficking.

   **B.    The ES Defendants facilitated sex trafficking, including the trafficking of Jane Doe (G.N.C.)**

95.    The ES Defendants facilitated widespread sex trafficking at the Embassy Suites Buffalo, including the trafficking of Jane Doe (G.N.C.).

   *1)    The ES Franchisee Defendants facilitated sex trafficking at the Embassy Suites Buffalo.*

96.    The ES Franchisee Defendants were responsible for the acts, omissions, and knowledge of all employees of the Embassy Suites Buffalo when operating the hotel because these acts and omissions were committed in the scope and course of employment, because they ratified these acts and omissions, and because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to them, of sex trafficking occurring at this hotel.

97.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Embassy Suites Buffalo, the ES Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

98.    The ES Franchisee Defendants knew or were willfully blind to the fact that Jane Doe (G.N.C.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue and tools, in the form of hotel rooms and related services, to harbor and maintain Jane Doe (G.N.C.) and to facilitate her sexual exploitation.

99.    The ES Franchisee Defendants also facilitated widespread trafficking at the Embassy Suites Buffalo, including the trafficking of Jane Doe (G.N.C.), in ways including:

    a.    Failing to adequately enforce policies, procedures and practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

    b.    choosing not to report known or suspected criminal activity including sex trafficking to law enforcement;

    c.    implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

100.    Through these actions, the ES Franchisee Defendants formed a a continuous business relationship with traffickers and encouraged them to return to the Embassy Suites Buffalo to exploit victims including Jane Doe (G.N.C.).

    *2)  The ES Brand Defendant facilitated sex trafficking at the Embassy Suites Buffalo*

101.    On information and belief, the ES Brand Defendant directly participated in renting rooms to traffickers at the Embassy Suites Buffalo, including to Jane Doe (G.N.C.)'s traffickers, in ways including, but not limited to, the following:

e.  The ES Brand Defendant controlled all details of the guest reservation, check-in, and payment processes through both its management and control over all systems used for those processes and its adoption of detailed and specific policies governing the means and methods hotel staff used for each of these processes.

f.  The ES Brand Defendant directly made reservations for rooms at the Embassy Suites Buffalo and accepted payment for those rooms through a central reservation system that it controlled and operated, and which franchisee was required to use. The ES Brand Defendant could reserve rooms and accept payments without requiring franchisee approval or involvement.

g.  The ES Brand Defendant controlled extension of existing room reservations and guests had to contact the ES Brand Defendant to extend reservations.

h.  The ES Brand Defendant controlled the payment methods that would be accepted and had access to information about which guests used which payment methods through its backend access to the reservation and payment systems they required their franchisee to use.

i.  The ES Brand Defendant controlled policies and protocols for guest identity verification at the time of check in.

j.  The ES Brand Defendant controlled room rates, required discounts, mandatory fees, and rewards programs.

k.  The ES Brand Defendant controlled and restricted the ability of hotel staff to refuse or cancel a reservation.

l.  The ES Brand Defendant collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Embassy Suites Buffalo, including the following categories of information: name, contact information (mailing address, email address, phone number), nationality, date of birth, gender, payment card information, Hilton Honors number, passport information, preferred language, room preference, room selection and assignment, arrival time, additional guest names, corporate travel planner contact information (name, title, company, business phone, email and address), corporate number and name, travel agent number and name, airline partner number and name, vehicle information, images or footage captured by closed circuit television (CCTV), internet or other electronic network activity information, including information regarding a customer's interaction with Hilton websites, applications, or advertisements, IP addresses, Session IDs, Booking engine, Whether a customer has a Hilton and American Express co-branded credit card, whether a customer's Hilton and Amazon accounts are linked, whether a customer's Hilton and Lyft accounts are linked, geolocation information, device information, social media information, demographics data, a customer's usability preferences regarding Hilton's website (such as a customer's email preferences, MyWay preferences, and opt-out preferences), description of a complaint that a customer makes to Hilton, including a customer's free form textual

feedback if the customer is a Hilton Honors member, customer ratings and survey responses, and free form textual feedback.[44]

m.  The ES Brand Defendant established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Embassy Suites Buffalo until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

n.  The ES Brand Defendant required franchisee to use their property management system, which was owned, maintained, controlled, and operated by the ES Brand Defendant, for virtually all aspects of hotel operations regarding room reservations and payment.

102.  Despite having active and constructive knowledge of the widespread sex trafficking at the Embassy Suites Buffalo, the ES Brand Defendant continued renting rooms to traffickers, including the trafficker of Jane Doe (G.N.C.).

103.  Upon information and belief, the ES Brand Defendant participated directly in aspects of the operation of the Embassy Suites Buffalo that influenced whether and to what extent trafficking occurred at the hotel, including, but not limited to, the following:

a.  The ES Brand Defendant retained control over and responsibility for training related to detecting and responding to human trafficking at the Embassy Suites Buffalo. The ES Brand Defendant retained controlled over whether training was provided, when it was provided, who provided it, how it was provided, the content of the training, and how effectiveness of the training was assessed. Hilton Worldwide tracks training on human trafficking issues at all its branded properties, including Embassy Suites hotels.[45]

b.  The ES Brand Defendant retained control over and responsibility for setting, supervising, overseeing, and enforcing all policies and protocols regarding detecting and responding to human trafficking at the Embassy Suites Buffalo. Hilton Worldwide has multiple corporate-level teams that are charged with implementing, overseeing and assessing these policies, protocols, and practices at branded hotels.

c.  The ES Brand Defendant required hotel staff members to report suspected trafficking to the Hilton Hotline or an incident alert mobile application.

---

[44] https://www.hilton.com/en/p/global-privacy-statement/

[45] https://esg.hilton.com/our-reporting/

d.  The ES Brand Defendant retained control over use of brand-wide data analytics to assess and address human trafficking Embassy Suites hotels.

e.  The ES Brand Defendant, through the Hilton Worldwide Global Compliance team, retained control over monitoring the volume of reports of suspected trafficking overall and at specific properties and responding appropriately.

f.  The ES Brand Defendant retained control over supervision and management of the response to suspicions of human trafficking at the hotel level by assigning the Hilton Worldwide Global Compliance team to review all hotline reports and the response to each report.

g.  The ES Brand Defendant assumed the responsibility to identify geographic locations and specific hotel properties that had a heightened risk of human trafficking and to enact appropriate measures to respond to properties with higher risk.

h.  The ES Brand Defendant assumed the responsibility to alert specific hotels, including the Embassy Suites Buffalo, of circumstances, prompting a high risk for trafficking activity.

i.  The ES Brand Defendant assumed responsibility for guest safety by collecting and maintaining and images or footage from closed circuit television (CCTV) at hotel properties[46]

j.  The ES Brand Defendant maintained control over all details of the terms under which franchised hotels, including the Embassy Suites Buffalo, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The ES Brand Defendant controlled whether certain sites known to be frequently used to advertise victims for trafficking would be blocked from the hotel's network.

k.  The ES Brand Defendant retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Embassy Suites Buffalo, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

l.  The ES Brand Defendant collected, maintained, and analyzed detailed data regarding housekeeping services at the Embassy Suites Buffalo including trends that would reveal patterns consistent with human trafficking.

---

[46] https://www.hilton.com/en/p/global-privacy-statement/#CollectionGenerally

104.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Embassy Suites Buffalo, the ES Brand Defendant continued participating in a venture at that hotel, with their franchisee and the hotel staff, in a way that the ES Brand Defendant knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

a. While the ES Brand Defendant publicly committed to the EPCAT Code in 2011, they unreasonably delayed and failed to take any significant steps to implement that commitment for several years.[47]

b. The ES Brand Defendant adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and front-line hotel staff regarding issues related to human trafficking.

c. The ES Brand Defendant delayed implementation of anti-trafficking training. While Hilton Worldwide committed to the EPCAT Code in 2011, it had completed no training in 2011 and 2012 and had only trained 879 individuals, across all its brands, by the time of its 2013 report.[48]

d. The ES Brand Defendant implicitly condoned and endorsed its franchisee's repeated decisions not to respond to suspected trafficking and other related criminal activity appropriately.

e. The ES Brand Defendant ignored policies that they had purportedly enacted and implemented.

f. The ES Brand Defendant continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Embassy Suites Buffalo.

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at the Embassy Suites Buffalo, the ES Brand Defendant declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at ES Branded properties.

h. The ES Brand Defendant attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

---

[47] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2012; https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013
[48] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013

i.  The ES Brand Defendant allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

j.  The ES Brand Defendant adopted and required their franchisee to adopt check in procedures that failed to ensure all hotel guests were appropriately identified and, instead, allowed guests to use the hotel with minimal risk of traceability.

k.  The ES Brand Defendant continued to allow the Embassy Suites Buffalo to profit by using brand trademarks despite actual or constructive knowledge of ongoing sex trafficking in that hotel. Lending the perceived legitimacy of the ES Brand affirmatively facilitated sex trafficking by providing a venue where sex trafficking could occur with minimal risk of detection by law enforcement or traceability.

l.  The ES Brand Defendant provided traffickers with access to internet services that Hilton knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

105.    If the ES Brand Defendant had exercised reasonable diligence when operating the Embassy Suites Buffalo and in the areas over which they retained control, then the ES Brand Defendant would have prevented the Embassy Suites Buffalo from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (G.N.C.). Instead, the ES Brand Defendant engaged conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (G.N.C.).

106.    The ES Brand Defendant should have known about Jane Doe (G.N.C.).'s trafficking because it retained control over the training of the staff of Buffalo Embassy Suites regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If the ES Brand Defendant had exercised reasonable diligence in providing training to hotel staff, it would have known about the obvious and apparent sex trafficking, including the trafficking of Jane Doe (G.N.C.). Thus, under §1595(a), constructive knowledge of that trafficking is imputed to the ES Brand Defendant.

107.    The ES Brand Defendant should have known about Jane Doe (G.N.C.)'s trafficking because it also retained control over the response of Embassy Suites hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, the ES Brand Defendant facilitated sex trafficking, including the sex trafficking of Jane Doe (G.N.C.) in their hotel. Thus, under §1595(a), constructive knowledge of that trafficking is imputed to the ES Brand Defendant.

108.    The ES Brand Defendant also should have known about Jane Doe (G.N.C.)'s trafficking because the ES Brand Defendant retained the control to adopt and enforce policies on this subject for its properties, including the Embassy Suites Buffalo, but failed to adopt and adequately enforce appropriate check-in, payment, and identification policies, which facilitated trafficking at the Embassy Suites Buffalo and allowed traffickers to access rooms for the purpose of harboring their victims, including Jane Doe (G.N.C.). Thus, under §1595(a), constructive knowledge of that trafficking is imputed to the ES Brand Defendant.

109.    The ES Brand Defendant also should have known about Jane Doe (G.N.C.)'s trafficking because it retained control over the security of the Embassy Suites Buffalo through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting the Embassy Suites Buffalo. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the ES Brand Defendant had used reasonable prudence in monitoring and reviewing this information, it would have known about the ongoing trafficking.

Thus, under §1595(a) constructive knowledge of that trafficking is imputed to the ES Brand Defendant.

110.     Jane Doe (G.N.C.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the ES Brand Defendant had used reasonable diligence in the aspects of hotel operations over which it retained control.

111.     Moreover, Jane Doe (G.N.C.)'s trafficker was able to operate without interference and without making significant effort at a concealment because the ES Brand Defendant adopted policies and practices that insulated Jane Doe (G.N.C.)'s trafficker from significant risk of detection or disruption.

### C. The ES Defendants' ventures at the Embassy Suites Buffalo

112.     The ES Defendants knowingly received substantial financial benefit from Plaintiff's traffickers, including but not limited to revenue generated from room rental and other ancillary expenses at the Embassy Suites Buffalo. Thus, the ES Defendants benefited directly from providing support to Plaintiff's traffickers, who the ES Defendants knew or should have known were engaged in illegal sex trafficking.

113.     ES Franchisee Defendants benefited through increased revenue from rooms rented to Jane Doe G.N.C.'s traffickers.

114.     The payments that ES Brand Defendant received under the franchising agreement with ES Franchisee Defendants were primarily determined by gross room revenue at the Embassy Suites Buffalo. As a result, the revenue received by the ES Brand Defendant directly increased with every room rented to a trafficker at the Embassy Suites Buffalo.

115.     By participating in a venture that facilitated sex trafficking, the ES Brand Defendants and ES Franchisee Defendants also benefitted by keeping operating costs low,

maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Embassy Suites Buffalo specifically.

116.    In ways described more fully above, The ES Brand Defendant and ES Franchisee Defendants knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, to rent rooms to sex traffickers which were used for exploitation and harboring of sex trafficking victims (hereinafter "Venture 1").

117.    The ES Brand Defendant and ES Franchisee Defendants formed this continuous business relationship with the traffickers at the Buffalo Embassy Suites by continuing to rent rooms to traffickers (including Jane Doe (G.N.C.)'s traffickers) long after the ES Brand Defendant and ES Franchisee Defendants knew or should have known that the rooms were being used for unlawful trafficking.

118.    This implicit understanding developed because sex traffickers, including Jane Doe (G.N.C.)'s sex traffickers, frequently used the Buffalo Embassy Suites for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the ES Brand Defendant and ES Franchisee Defendants that created a favorable environment for sex trafficking to flourish.

119.    Both the ES Brand Defendant and ES Franchisee Defendants participated in this venture by acting jointly to rent rooms to traffickers. ES Franchisee Defendants provided "boots on the ground" for reservations, and the ES Brand Defendant directly participated in renting rooms, retained control over reservation systems, and developed and enforced applicable policies and guidelines as further described in this Complaint. Each Defendant participated in the venture by

continuing to rent rooms to Jane Doe (G.N.C.)'s traffickers long after they knew or should have known that victims like Jane Doe (G.N.C.) were being subjected to unlawful trafficking.

120.    The ES Brand Defendant and ES Franchisee Defendants did not only provide these traffickers with a physical space (harboring) but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to a continuous business relationship, which is evidenced by, among other things:

a. Jane Doe (G.N.C.)'s traffickers were familiar to the staff at the Buffalo Embassy Suites;

b. Jane Doe (G.N.C.)'s traffickers took no steps to conceal their activities from the staff at the Buffalo Embassy Suites but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff;

c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

d. Defendants provided additional services to traffickers (including Jane Doe (G.N.C.)'s traffickers), including but not limited to, internet access, excessive towels and linens, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

121.    The criminal traffickers operating at the Buffalo Embassy Suites as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (G.N.C.)

122.    Jane Doe (G.N.C.)'s trafficking at the Buffalo Embassy Suites West was a result of the ES Brand Defendant and ES Franchisee Defendants' participation in Venture 1 with the criminal traffickers. If the ES Brand Defendant and ES Franchisee Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (G.N.C.)'s trafficking at the Buffalo Embassy Suites.

123.    In ways described more fully above, the ES Brand Defendant also knowingly received a financial benefit from participating in a commercial venture with ES Franchisee Defendants operating the Buffalo Embassy Suites (hereinafter "Venture 2").

124.    The ES Brand Defendant and ES Franchisee Defendants had a longstanding business relationship pursuant to which they jointly participated in operation of the Buffalo Embassy Suites with a shared goal of maximizing revenue, including gross room revenue.

125.    Venture 2 violated the TVRPA through the widespread sex trafficking at the Buffalo Embassy Suites, including Jane Doe (G.N.C.), and through the conduct of Franchisee who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2). The trafficking facilitated by Venture 2 involved multiple traffickers and multiple victims. This facilitation was ongoing and persisted long after each Defendant knew or should have known about the trafficking.[49]

126.    Despite its actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), The ES Brand Defendant participated in the venture by continuing to operate the Buffalo Embassy Suites with Franchisee in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (G.N.C.). The ES Brand Defendant continued providing ES Franchisee Defendants with operational support, use of its trademarks, marketing services, and other resources to operate the Buffalo Embassy Suites in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).[50]

127.    The ES Brand Defendant knew its policies and practices were causing widespread sex trafficking at its hotels, including the Buffalo Embassy Suites and, nonetheless, continued operating in a way that it knew would result in further benefit from sex trafficking at its properties.

---

[49] *See supra* paragraph 94-95.
[50] *See supra* paragraph 114-131.

128.    As a result of the monies paid by Jane Doe (G.N.C.)'s traffickers to the secure rooms for her trafficking at Buffalo Embassy Suites, the ES Brand Defendant and ES Franchisee Defendants knowingly benefitted from participating in the venture that they knew or should have known trafficked, harbored, and maintained Jane Doe's trafficking at Buffalo Embassy Suites.

### D. The ES Franchisee Defendants and staff at the Embassy Suites Buffalo acted as actual agents of the ES Brand Defendant.

129.    The ES Brand Defendant subjected franchisee to detailed standards and requirements regarding the operation of the Embassy Suites Buffalo through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the ES Brand Defendant. The ES Brand Defendant obscure the full extent of control they exercise over the franchisee by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. These written standards, protocols, and requirements:

a. Did not merely identify quality or outcome standards, but instead specifically controlled the means, methods, and tools franchisee used at the Embassy Suites Buffalo, such as providing hotel staff with step-by-step on how to perform tasks at the hotel and mandating that Franchisee use computer systems and software selected, owned and controlled by the ES Brand Defendant

b. Covered virtually all aspects of hotel operations, including internal operating functions;

c. Dictated the specific way franchisee and hotel staff must carry out most day-to-day functions at the Embassy Suites Buffalo; and

d. Significantly exceeded what was necessary for the ES Brand Defendant to protect its registered trademarks.

130.    In addition to the ways described above, upon information and belief, the ES Brand Defendant exercised and reserved the right to exercise systemic and pervasive control over day-to-day operation of the Embassy Suites Buffalo in ways including but not limited to the following:

a. The ES Brand Defendant required their franchisee and management of the Embassy Suites Buffalo to participate in mandatory training programs, both during

onboarding and on an annual basis, regarding all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary to protect brand trademarks.

b.  The ES Brand Defendant retained the right to mandate and control training for hotel staff and actually maintained and controlled training for hotel staff on topics it selected. The ES Brand Defendant required onsite and online training for all hotel staff, including mandatory training for all hotel-based employees at the time of hire and ongoing training as dictated by the ES Brand Defendant.

c.  The ES Brand Defendant controlled the details of training conducted for hotel staff by franchisee by requiring the use of standardized training methods and materials.

d.  The ES Brand Defendant set required staffing levels for the Embassy Suites Buffalo.

e.  The ES Brand Defendant adopted detailed job descriptions for each position at the Embassy Suites Buffalo and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

f.  The ES Brand Defendant exercised control over the hiring process for hotel staff by mandating interview techniques, setting hiring criteria, and controlling requirements for background and reference check.

g.  The ES Brand Defendant retained the right to approve or reject hiring of the general manager of the hotel.

h.  The ES Brand Defendant imposed and enforced detailed requirements for all aspects of hotel facilities.

i.  The ES Brand Defendant required that their franchisee use Hilton's preferred vendors to purchase goods necessary for day-to-day operation of the hotel.

j.  The ES Brand Defendant entered into exclusive purchasing agreements with vendors, including through the Primary Supplier Distribution Program, and required franchisees to purchase goods and supplies from a single source selected by the ES Brand Defendant. The ES Brand Defendant did not do this solely to assure uniformity of brand but, instead, did this for their own financial benefit as they routinely received rebates from vendors selected through these purchasing agreements.

k.  The ES Brand Defendant required franchisees to participate in a guaranteed rate program through which their franchisee must pay rate difference and pay for gift cards issued to guests if the guests find a room at the hotel at a rate lower than offered through a central reservation system.

l.  The ES Brand Defendant controlled channels for guests to report complaints or provide feedback about the Embassy Suites Buffalo.

m.  The ES Brand Defendant required franchisees to participate in a Guest Assistance Program and retained the right to require franchisee to take specific actions to resolve guest complaints, including providing rebates and cash refunds.

n.  The ES Brand Defendant required their franchisee to use systems the ES Brand Defendant owned, operated, and controlled for, among other things, revenue management, hotel operations, and business intelligence gathering and analysis.

o.  The ES Brand Defendant provided day-to-day services through the back-end operation of the property management system used for virtually all aspects of running the Embassy Suites Buffalo.

p.  The ES Brand Defendant required their franchisee to use electronic mail systems maintained by Hilton Worldwide, which are maintained, controlled, and monitored by Hilton Worldwide.

q.  The ES Brand Defendant were directly involved in installing hardware and software systems and providing day-to-day maintenance and repair of these systems at the Embassy Suites Buffalo.

r.  The ES Brand Defendant required their franchisee to join and participate in a franchisee association with other branded hotels.

s.  The ES Brand Defendant controlled all marketing for the Embassy Suites Buffalo. The ES Brand Defendant exercised this control on a day-to-day basis by going beyond setting standards and, instead, requiring their franchisee to get prior approval of any marketing or advertising materials.

t.  The ES Brand Defendant set detailed standards regarding the insurance franchisee was required to purchase and maintain, including requirements for specific provisions that must be in the policy, who must be insured, in what amount, and what insurers the franchisee could use.

u.  The ES Brand Defendant imposed detailed recordkeeping and reporting requirements on franchisee LLC regarding virtually all aspects of hotel operation, including internal operations.

v.  The ES Brand Defendant retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

w.  The ES Brand Defendant retained the right to inspect the Embassy Suites Buffalo, including through unannounced inspections, and to perform audits. The Embassy Suites exercised this control and inspected and audited virtually all aspects of hotel operations, including internal operations and issues related to guest safety.

x.  The ES Brand Defendant retained control to require their franchisee to make operational changes within a time established by the ES Brand Defendant.

y.  The ES Brand Defendant monitored day-to-day operations of the Embassy Suites Buffalo through constant monitoring of guest surveys, online reviews, customer complaints, and data from the back-end of the systems it required their franchisee to use.

z.  The ES Brand Defendant retained the right to impose penalties and ultimately to terminate the franchise agreement if their franchisee violated standards, rules, regulations, or expectations.

131.    The ES Brand Defendant is also vicariously liable because it retained and exercised control over the specific instrumentalities and aspects of operations that caused Jane Doe (G.N.C.)'s harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. The ES Brand Defendant had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

132.    As a result of the foregoing, the ES Brand Defendant is liable to Jane Doe (G.N.C.) as a result of direct liability through its commercial Venture 1 (with the trafficker) and Venture 2 (with its franchisee) and vicariously liable as a result of the knowledge, actions and inactions of its agent ES Franchisee Defendant.

## III.    The TVPRA violations at the Hotel Pennsylvania.

133.    On multiple occasions in or around November 2016, Jane Doe (G.N.C.) was trafficked at the Hotel Pennsylvania. The Hotel Pennsylvania Defendants each benefitted from the rental of the rooms that were used to sexually exploit victims, including Jane Doe (G.N.C.). The Hotel Pennsylvania Defendants knew or should have known they were facilitating sex trafficking at the Hotel Pennsylvania, including the trafficking of Jane Doe (G.N.C.).

### A.    The Hotel Pennsylvania Defendants' Knowledge of Sex Trafficking

134.    The Hotel Pennsylvania Defendants have known, since well before Jane Doe (G.N.C.)'s trafficking, that there was widespread sex trafficking at the Hotel Pennsylvania.

135.    Sex trafficking was prevalent at the Hotel Pennsylvania and occurred in a way that was obvious and apparent.

136.    Public information, including online reviews, confirms both the widespread sex trafficking problem at the Hotel Pennsylvania and the Hotel Pennsylvania Defendants' knowledge

of this sex trafficking. Upon information and belief, the Hotel Pennsylvania Defendants monitored online reviews for indicia of criminal activity, including sex trafficking.

137.    Examples of online review confirming the widespread presence of trafficking, prostitution, and related criminal activity at the Hotel Pennsylvania include:

    a.    A 2012 review noted "This hotel has been rated 3 years running as the Best Place to kill a prostitute." [51]

    b.    A 2013 review noted "It's like the Bates Motel except with a higher likelihood of being murdered. I was surprised to not find a dead hooker in the bathtub."[52]

    c.    A 2016 review noted the registration area was "was filled with prostitutes" and staffing was inadequate.[53]

    d.    A 2019 review noted "Security allows prostitutes to solicit in the lobby and enter elevators with guests. NOT KID FRIENDLY. I would only stay here again if the prices were half listed. Would prefer to stay on the sidewalk!"[54]

    e.    Multiple reviews mentioned staff and management dismissal of customer complaints about safety, drug and sex paraphernalia found in rooms, and repeated reports about non-functioning locks and guests being sent to rooms already occupied by other guests.[55]

138.    Upon information and belief, traffickers, including Jane Doe (G.N.C.)'s trafficker, repeatedly chose to use the Hotel Pennsylvania, such that there was a population of traffickers who operated at this hotel. They selected this hotel because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. There were obvious and apparent signs of this widespread trafficking activity,

---

[51] https://www.yelp.com/biz/hotel-pennsylvania-new-york?hrid=K0QQjjzOj3WNurhcOI6RXg

[52] https://www.yelp.com/biz/hotel-pennsylvania-new-york?hrid=K0QQjjzOj3WNurhcOI6RXg

[53] https://www.yelp.com/biz/hotel-pennsylvania-new-york?hrid=K0QQjjzOj3WNurhcOI6RXg

[54] https://www.yelp.com/biz/hotel-pennsylvania-new-york?hrid=K0QQjjzOj3WNurhcOI6RXg

[55] *See, e.g.*, https://www.yelp.com/biz/hotel-pennsylvania-new-york?hrid=K0QQjjzOj3WNurhcOI6RXg;

consistent with the well-known "red flags" of sex trafficking in the hospitality industry, that the Hotel Pennsylvania knew or should have known about.

139.    Based upon information and belief, the traffickers, including Jane Doe (G.N.C.)'s trafficker, operated at the Hotel Pennsylvania with little regard for concealment, due to an implicit understanding between the hotel staff of the Hotel Pennsylvania and the traffickers. This understanding enabled the traffickers to operate efficiently, as they had found a venue where they could conduct their operations without disruption from Defendants.

140.    Upon information and belief, and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Hotel Pennsylvania, by multiple traffickers, who exhibited "red flags" of sex trafficking, that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, refusing room cleaning services, and other signs consistent with the "red flags" of trafficking identified above.

141.    Upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of the victims, as well as the nature of the victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

142.    The Hotel Pennsylvania Defendants, acting individually and jointly, directly participated in operation of the Hotel Pennsylvania and, therefore, directly monitored and supervised activity at the hotel.

143.    The Hotel Pennsylvania Defendants are all affiliated entities subject to common control and that jointly operated the Hotel Pennsylvania and shared revenue and profit from operation of the hotel.

144.    All knowledge from the hotel staff is imputed to the Hotel Pennsylvania Defendants who jointly employ and/or control the hotel staff. The Hotel Pennsylvania Defendants knew about this widespread and ongoing trafficking at the Hotel Pennsylvania, including the trafficking of Jane Doe (G.N.C.), through the direct observations of hotel staff, including management-level staff, and information otherwise relayed to this staff by other staff members, guests, and other sources.

145.    Upon information and belief, in addition to public source of information about trafficking, The Hotel Pennsylvania Defendants knew or should have known about the widespread trafficking at the Hotel Pennsylvania based on non-public sources of information including but not limited to:

a.    Direct observation of hotel staff and management;

b.    Surveillance of the property;

c.    Customer complaints;

d.    Monitoring of online reviews and other customer feedback;

e.    Information received from law enforcement; and

f.    Other sources of non-public information available to the Hotel Pennsylvania Defendants.

146.    The Hotel Pennsylvania Defendants had constructive knowledge of the widespread and ongoing trafficking at the Hotel Pennsylvania because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

147. During the period that Jane Doe (G.N.C.) was trafficked at the Hotel Pennsylvania, there were obvious signs, observed by hotel staff, that her trafficker was engaged in sex trafficking:

   a. The rooms at this hotel would be booked in the name of one of the johns or another victim who was being trafficked at this hotel at the same time.

   b. Jane Doe (G.N.C.)'s trafficker was trafficking other victims at this hotel at or around the same time Jane Doe (G.N.C.) was being trafficked there.

   c. The hotel rooms in which she was trafficked were frequently paid for with prepaid cards.

   d. Jane Doe (G.N.C.)'s trafficker would not allow housekeeping to enter the room where Jane Doe (G.N.C.) was being exploited. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services.

   e. The trafficker was often present with Jane Doe (G.N.C.) at check in and would linger around the hotel or in the parking lot while she was with a john.

   f. Jane Doe (G.N.C.)'s trafficker beat her in the rooms of this hotel, causing her to suffer visible injuries.

   g. Jane Doe (G.N.C.)'s demeanor reflected her fear of her trafficker and the control he was exercising over her.

   h. There was heavy foot traffic in and out of Jane Doe (G.N.C.)'s room involving men who were not hotel guests.

   i. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel, including but not limited to those described above.

148. Based upon information and belief, multiple employees at the Hotel Pennsylvania, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

149. Based on this and on the other methods, listed above, that they used to monitor and supervise the Hotel Pennsylvania, the Hotel Pennsylvania Defendants knew or were willfully blind to the fact that Jane Doe (G.N.C.) was being trafficked at the Hotel Pennsylvania.

150.     Given these obvious signs, the Hotel Pennsylvania Defendants knew or should have known about the trafficking of Jane Doe (G.N.C.) based on their policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

151.     The Hotel Pennsylvania Defendants also knew or should have known about Jane Doe (G.N.C.)'s trafficking based on the other methods, listed above, that they used to monitor and supervise the Hotel Pennsylvania.

152.     The Hotel Pennsylvania Defendants had constructive knowledge of the trafficking of Jane Doe (G.N.C.) at the Hotel Pennsylvania because her trafficking was the direct result of their facilitation of trafficking at that hotel.

**B.  The Hotel Pennsylvania Defendants facilitated sex trafficking, including the trafficking of Jane Doe (G.N.C.)**

153.     The Hotel Pennsylvania Defendants facilitated widespread sex trafficking at the Hotel Pennsylvania, including the trafficking of Jane Doe (G.N.C.).

154.     The Hotel Pennsylvania Defendants were responsible for the acts, omissions, and knowledge of all employees of the Hotel Pennsylvania when operating the hotel because these acts and omissions were committed in the scope and course of employment, because they ratified these acts and omissions, and because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to them, of sex trafficking occurring at this hotel.

155.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Hotel Pennsylvania, the Hotel Pennsylvania Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

156.     The Hotel Pennsylvania Defendants knew or were willfully blind to the fact that Jane Doe (G.N.C.) was being trafficked and, despite this, benefited from continued association

with her trafficker by providing a venue and tools, in the form of hotel rooms and related services, to facilitate Jane Doe (G.N.C.)'s sexual exploitation.

157.    The Hotel Pennsylvania Defendants also facilitated widespread trafficking at the Hotel Pennsylvania, including the trafficking of Jane Doe (G.N.C.), in ways including:

a.   Following inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

b.   Choosing not to report known or suspected criminal activity including sex trafficking to law enforcement;

c.   Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

d.   Continuing to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Hotel Pennsylvania.

e.   Despite having specific knowledge of policies that would significantly reduce sex trafficking at the Hotel Pennsylvania, declining to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at the Hotel Pennsylvania.

f.   Allowing traffickers to reserve rooms using cash or prepaid cards, which provided relative anonymity and non-traceability.

g.   Adopting check in procedures that failed to ensure all hotel guests and visitors were appropriately identified and, instead, allowing traffickers and johns to use the hotel with minimal risk of traceability.

158.    If The Hotel Pennsylvania Defendants had exercised reasonable diligence when operating the Hotel Pennsylvania, then the Hotel Pennsylvania Defendants would have prevented the Hotel Pennsylvania from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (G.N.C.). Instead, the Hotel Pennsylvania Defendants engaged in conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (G.N.C.).

### C. The Hotel Pennsylvania Defendants' ventures

159.    The Hotel Pennsylvania Defendants knowingly received substantial financial benefit from Plaintiff's traffickers, including but not limited to revenue generated from room rental and other ancillary expenses at the Hotel Pennsylvania. Thus, the Hotel Pennsylvania Defendants benefited directly from providing support to Plaintiff's traffickers, who the Hotel Pennsylvania Defendants knew or should have known were engaged in illegal sex trafficking.

160.    The Hotel Pennsylvania Defendants benefited through increased revenue from rooms rented to Jane Doe G.N.C.'s traffickers. Upon information and belief, revenue received from rooms rented at the Hotel Pennsylvania was distributed among the Hotel Pennsylvania Defendants pursuant to written agreements and/or informal practices.

161.    Through the conduct described above, the Hotel Pennsylvania Defendants knowingly benefitted from engaging in a venture with sex traffickers at the Hotel Pennsylvania, including Jane Doe (G.N.C.)'s trafficker, as follows:

     a. The Hotel Pennsylvania Defendants received benefits, including increased revenue, every time a room was rented at the Hotel Pennsylvania.

     b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Hotel Pennsylvania, which the Hotel Pennsylvania knew or should have known about.

     c. The Hotel Pennsylvania Defendants associated with traffickers, including Jane Doe (G.N.C.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

     d. The Hotel Pennsylvania Defendants had a mutually beneficial relationship with the traffickers at the Hotel Pennsylvania, fueled by sexual exploitation of victims, including Jane Doe (G.N.C.).

     e. Sex traffickers, including Jane Doe (G.N.C.)'s traffickers, frequently used the Hotel Pennsylvania for their trafficking because of an implicit understanding that the Hotel Pennsylvania was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of the Hotel Pennsylvania Defendants facilitating

that trafficking as described throughout this Complaint. This resulted in benefits, including increased revenue, for the Hotel Pennsylvania Defendants.

f.   The Hotel Pennsylvania Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g.   Jane Doe (G.N.C.)'s trafficking at the Hotel Pennsylvania was a result of the Hotel Pennsylvania Defendants' participation in a venture with criminal traffickers. If the Hotel Pennsylvania Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (G.N.C.)'s trafficking at the Hotel Pennsylvania.

162.   Through the conduct described above, the Hotel Pennsylvania Defendants also knowingly benefited from engaging in a commercial venture with one another and with the hotel staff operating the Hotel Pennsylvania as follows:

a.   The Hotel Pennsylvania Defendants associated with one another and the hotel staff to operate the Hotel Pennsylvania.

b.   On information and belief, each of the Hotel Pennsylvania Defendants received financial benefits from operating the Hotel Pennsylvania, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c.   By participating in a venture that facilitated sex trafficking, the Hotel Pennsylvania Defendants also benefited by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Hotel Pennsylvania specifically.

d.   This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of the hotel staff and the widespread sex trafficking at the Hotel Pennsylvania.

e.   Despite their actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Hotel Pennsylvania Defendants participated in the venture by continuing to associate with Franchisee Defendant to operate the Hotel Pennsylvania in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (G.N.C.).

f.   Jane Doe (G.N.C.)'s trafficking at the Hotel Pennsylvania was a result of the Hotel Pennsylvania Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Hotel Pennsylvania. Had each Hotel

Pennsylvania Defendant not continued participating in a venture that each knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the defendant would not have received a benefit from Jane Doe (G.N.C.)'s trafficking at the Hotel Pennsylvania.

163.    Upon information and belief, the Hotel Pennsylvania Defendants are corporate affiliates who shared officers, directors, and employees and who had a high degree of integration of operations operating the Hotel Pennsylvania.

164.    Upon information and belief, the Hotel Pennsylvania Defendants engaged in a joint venture operating the Hotel Pennsylvania because they engaged in profit sharing, mutual control, and a high degree of interrelations of operations such that each of the Hotel Pennsylvania Defendants is vicariously liable for each of the other Hotel Pennsylvania Defendants.

## IV.    The TVPRA violations at the Boulevard Inn.

165.    Jane Doe (G.N.C.) was trafficked many times at the Boulevard Inn, which was one of the primary locations used by her trafficker. The period during which Jane Doe (G.N.C.) was trafficked at this hotel includes but is not limited to repeated incidents of trafficking in early 2017. The Boulevard Inn Defendants each benefited from renting rooms that were used to sexually exploit victims, including Jane Doe (G.N.C.). The Boulevard Inn Defendants knew or should have known they were facilitating sex trafficking at Boulevard Inn, including the trafficking of Jane Doe (G.N.C.).

### A.  The Boulevard Inn Defendants' Knowledge of Sex Trafficking

166.    The Boulevard Inn Defendants have known, since well before Jane Doe (G.N.C.)'s trafficking, that there was widespread sex trafficking at the Boulevard Inn.

167.    Sex trafficking was prevalent at the Boulevard Inn and occurred in a way that was obvious and apparent.

49

168.   The Boulevard Inn was located in an area known to be at high risk for human trafficking activity.[56]

169.   Public information, including online reviews and news articles, confirms both the widespread sex trafficking problem at the Boulevard Inn and the Boulevard Inn Defendants' knowledge of this sex trafficking. Upon information and belief, the Boulevard Inn Defendants monitored online reviews and news reports for indicia of criminal activity, including sex trafficking.

170.   Example of news stories that confirm the presence of widespread criminal activity, including sex trafficking, at the Boulevard Inn include:

  a.   In 2012, an arrest in the Boulevard Inn parking lot of a car circling the lot led to charges for coercion and sex trafficking in addition to weapons and drug related charges.[57]

  b.   In 2017 man pleaded guilty to sex trafficking for recruiting girls as young as 14 and luring them into the sex trafficking ring that he ran out of the Boulevard Inn.[58]

  c.   The Comptroller of the State of New York criticized Erie County for putting families in need of emergency shelter at the Boulevard Inn because of the high volume of calls for drug-related offense, prostitution, theft, and other crimes.[59]

171.   Examples of online review confirming the widespread presence of trafficking, prostitution, and related criminal activity at the Boulevard Inn include:

  a.   A 2016 review noted that the hotel was not a good place to stay but "more like a place for hookers to go."[60]

  b.   A 2019 review notes that this "place is meant for prostitutes!!!!"[61]

---

[56]https://www.wgrz.com/article/news/local/western-new-york-focuses-on-human-trafficking/71-ea27d963-c931-4bb9-8ddf-8b1538363edf.

[57] Buffalo New (New York) Western New York Edition at Pg. D3 (May 9, 2008).

[58] https://www2.erie.gov/da/index.php?q=press/buffalo-man-pleads-guilty-sex-trafficking-charges

[59] https://buffalonews.com/news/local/comptroller-says-erie-county-places-some-needy-families-in-unsafe-hotels/article_d0e93692-bf8d-56a7-855a-58a2f09d0560.html

[60] https://www.expedia.com/Buffalo-Hotels-Boulevard-Inn.h7623316.Hotel-Reviews

[61] https://www.expedia.com/Buffalo-Hotels-Boulevard-Inn.h7623316.Hotel-Reviews

    c.  A 2020 review notes that a housekeeping staff member noted that the hotel was able to charge such high rates because the motel is used for prostitution.[62]

    d.  A 2021 review noted a drug addict was "casing" for customers at the hotel.[63]

    e.  A 2022 review observed that it sounded "like they had sex trafficking going on at the hotel." [64]

172.    On information and belief, the Boulevard Inn Defendants also owned and operated the nearby University Manor Inn, which was also had a problem with sex trafficking and related criminal activity,[65] which the Boulevard Inn Defendants knew or should have known about. For example, in 2016 a trafficker admitted to selling 14-year-old children to "johns" at the University Manor Inn.[66]

173.    Upon information and belief, traffickers, including Jane Doe (G.N.C.)'s trafficker, repeatedly chose to use the Boulevard Inn, such that there was a population of traffickers who operated at this hotel. They selected this hotel because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. There were obvious and apparent signs of this widespread trafficking activity, consistent with the well-known "red flags" of sex trafficking in the hospitality industry, that the Boulevard Inn Defendants knew or should have known about.

174.    Based upon information and belief, the traffickers, including Jane Doe (G.N.C.)'s trafficker, operated at the Boulevard Inn with little regard for concealment, due to an implicit

---

[62] https://www.booking.com/hotel/us/boulevard-inn-niagara-falls.en-gb.html?aid=356980&label=gog235jc-1DCAso7AFCG2JvdWxldmFyZC1pbm4tbmlhZ2FyYS1mYWxsc0gzWANotQGIAQGYAQm4ARfIAQzYAQPoAQGIAgGoAgO4AviB-J4GwAIB0gIkYTc0N2M2NmEtM2Y2MC00NGM1LWI2Y2UtNmQxOTllNjQ4MDE52AIE4AIB&dist=0&group_adults=2&keep_landing=1&sb_price_type=total&type=total&

[63] https://www.expedia.com/Buffalo-Hotels-Boulevard-Inn.h7623316.Hotel-Reviews

[64] https://www.expedia.com/Buffalo-Hotels-Boulevard-Inn.h7623316.Hotel-Reviews

[65] https://buffalonews.com/news/local/comptroller-says-erie-county-places-some-needy-families-in-unsafe-hotels/article_d0e93692-bf8d-56a7-855a-58a2f09d0560.html

[66] https://buffalonews.com/news/local/article_a81a7f39-4716-5122-839b-bc9acf46ff5b.html

understanding between the hotel staff of the Boulevard Inn and the traffickers. This understanding enabled the traffickers to operate efficiently, as they had found a venue where they could conduct their operations without disruption from the Boulevard Inn Defendants.

175.    Upon information and belief, and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Boulevard Inn, by multiple traffickers, who exhibited "red flags" of sex trafficking, that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, refusing room cleaning services, and other signs consistent with the "red flags" of trafficking identified above.

176.    Upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of the victims, as well as the nature of the victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

177.    Staff of the Boulevard Inn, including management-level staff, had a familiar relationship with Jane Doe (G.N.C.)'s trafficker who used the Boulevard Inn to traffic multiple victims. The staff, including management-level staff, would tip the trafficker off if law enforcement showed up at the Boulevard Inn.

178.    The Boulevard Inn Defendants, acting individually and jointly, directly participated in operation and management of the Boulevard Inn and thus directly monitored and supervised activity at the hotel.

179.    All knowledge from the hotel staff is imputed to the Boulevard Inn Defendants who jointly employed and/or controlled the hotel staff. The Boulevard Inn Defendants knew about this

widespread and ongoing trafficking at the Boulevard Inn, including the trafficking of Jane Doe (G.N.C.), through the direct observations of hotel staff, including management-level staff, and information otherwise relayed to this staff by other staff members, guests, and other sources.

180.    Upon information and belief, in addition to available public source of information about trafficking, the Boulevard Inn Defendants knew or should have known about the widespread trafficking at the Boulevard Inn based on non-public sources of information including but not limited to:

   a.   Direct observation of hotel staff and management;

   b.   Surveillance of the property;

   c.   Customer complaints;

   d.   Monitoring of online reviews and other customer feedback;

   e.   Information received from law enforcement; and

   f.   Other sources of non-public information available to the Boulevard Inn Defendants.

181.    The Boulevard Inn Defendants had constructive knowledge of the widespread and ongoing trafficking at the Boulevard Inn because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

182.    During the period that Jane Doe (G.N.C.) was trafficked at Boulevard Inn, there were obvious signs, observed by hotel staff, that her trafficker was engaged in sex trafficking, including:

   a.   Jane Doe (G.N.C.)'s trafficker would book rooms, often using the name of Jane Doe (G.N.C.) or another sex trafficking victim who was frequently trafficked at this same hotel.

   b.   The hotel rooms in which she was trafficked were frequently paid for with prepaid cards.

c.  Other women were being trafficked at the Boulevard Inn at the same time as Jane Doe (G.N.C.).

d.  Jane Doe (G.N.C.)'s trafficker would not allow housekeeping to enter the room where Jane Doe (G.N.C.) was being exploited. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services.

e.  Jane Doe (G.N.C.) would request extra linens and towels but would exchange them at the door.

f.  The trafficker was often present with Jane Doe (G.N.C.) at check in and would linger around the hotel or in the parking lot while she was with a john.

g.  Jane Doe (G.N.C.)'s demeanor reflected her fear of her trafficker and the control he was exercising over her.

h.  There were obvious signs that Jane Doe (G.N.C.)'s trafficker kept her under the influence of drugs while at this hotel.

i.  There was heavy foot traffic in and out of Jane Doe (G.N.C.)'s room involving men who were not hotel guests. Between 10 and 15 men would come out of her room each day.

j.  Jane Doe's trafficker had a relationship with hotel staff. Her trafficker would provide the hotel staff with drugs, and the hotel staff would alert her trafficker when police were in the area.

k.  Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel, including but not limited to those described above.

183.  Based upon information and belief, multiple employees at the Boulevard Inn, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

184.  Based on this and on the other methods, listed above, that they used to monitor and supervise the hotel, the Boulevard Inn Defendants knew or were willfully blind to the fact that Jane Doe (G.N.C.) was being trafficked at the Boulevard Inn.

185.    It is apparent that hotel staff, including management-level staff, knew about the activities of Jane (G.N.C.)'s trafficker because they developed a relationship with the trafficker and alerted him when law enforcement was coming to the hotel.

186.    Given these obvious signs, the Boulevard Inn Defendants knew or should have known about the trafficking of Jane Doe (G.N.C.) based on their policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

187.    The Boulevard Inn Defendants had constructive knowledge of the trafficking of Jane Doe (G.N.C.) at the Boulevard Inn because her trafficking was the direct result of their facilitation of trafficking at that hotel.

### B. The Boulevard Inn Defendants facilitated sex trafficking, including the trafficking of Jane Doe (G.N.C.)

188.    The Boulevard Inn Defendants facilitated widespread sex trafficking at the Boulevard Inn, including the trafficking of Jane Doe (G.N.C.).

189.    The Boulevard Inn Defendants were responsible for the acts, omissions, and knowledge of all employees of the Boulevard Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because they ratified these acts and omissions, and because they failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to them, of sex trafficking occurring at this hotel.

190.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Boulevard Inn, the Boulevard Inn Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit Jane Doe (G.N.C.).

191.    The Boulevard Inn Defendants knew or were willfully blind to the fact that Jane Doe (G.N.C.) was being trafficked and, despite this, benefited from continued association with her

trafficker by providing a venue and tools, in the form of hotel rooms and related services, to facilitate Jane Doe (G.N.C.)'s sexual exploitation.

192.   The Boulevard Inn Defendants also facilitated widespread trafficking at the Boulevard Inn, including the trafficking of Jane Doe (G.N.C.), in ways including:

    a.   Forming relationships with traffickers and alerting them when law enforcement arrived at the hotel;

    b.   Following inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

    c.   Choosing not to report known or suspected criminal activity including sex trafficking according to law enforcement;

    d.   Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

    e.   Continuing to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Boulevard Inn.

    f.   Despite having specific knowledge of policies that would significantly reduce sex trafficking at the Boulevard Inn, declining to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at the Boulevard Inn.

    g.   Allowing traffickers to reserve rooms using cash or prepaid cards, which provided relative anonymity and non-traceability.

    h.   Adopting check in procedures that failed to ensure all hotel guests and visitors were appropriately identified and, instead, allowing traffickers and johns to use the hotel with minimal risk of traceability.

193.   If the Boulevard Inn Defendants had exercised reasonable diligence when operating the Boulevard Inn, then the Boulevard Inn Defendants would have prevented the Boulevard Inn from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (G.N.C.). Instead, the Boulevard Inn Defendants engaged in conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (G.N.C.).

### C. The Boulevard Inn Defendants' ventures

194.    The Boulevard Inn Defendants knowingly received substantial financial benefit from Plaintiff's traffickers, including but not limited to revenue generated from room rental and other ancillary expenses at the Hotel Pennsylvania. Thus, the Boulevard Inn Defendants benefited directly from providing support to Plaintiff's traffickers, who the Boulevard Inn Defendants knew or should have known were engaged in illegal sex trafficking.

195.    The Boulevard Inn Defendants benefited through increased revenue from rooms rented to Jane Doe G.N.C.'s traffickers. Upon information and belief, revenue received from rooms rented at the Hotel Pennsylvania was distributed among the Boulevard Inn Defendants pursuant to written agreements and/or informal practices.

196.    Through the conduct described above, the Boulevard Inn Defendants knowingly benefitted from engaging in a venture with sex traffickers at the Boulevard Inn, including Jane Doe (G.N.C.)'s trafficker, as follows:

  a. The Boulevard Inn Defendants received benefits, including increased revenue, every time a room was rented at the Boulevard Inn.

  b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Boulevard Inn, which the Boulevard Inn knew or should have known about.

  c. The Boulevard Inn Defendants associated with traffickers, including Jane Doe (G.N.C.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

  d. The Boulevard Inn Defendants had a mutually beneficial relationship with the traffickers at the Boulevard Inn, fueled by sexual exploitation of victims, including Jane Doe (G.N.C.).

  e. Sex traffickers, including Jane Doe (G.N.C.)'s traffickers, frequently used the Boulevard Inn for their trafficking because of an implicit understanding that the Boulevard Inn was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of the Boulevard Inn Defendants facilitating that trafficking

as described throughout this Complaint. This resulted in benefits, including increased revenue, for the Boulevard Inn Defendants.

f.  The Boulevard Inn Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g.  Jane Doe (G.N.C.)'s trafficking at the Boulevard Inn was a result of the Boulevard Inn Defendants' participation in a venture with criminal traffickers. If the Boulevard Inn Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (G.N.C.)'s trafficking at the Boulevard Inn.

197.    Through the conduct described above, the Boulevard Inn Defendants also knowingly benefited from engaging in a commercial venture with one another and with the hotel staff operating the Boulevard Inn as follows:

a.  The Boulevard Inn Defendants associated with one another and the hotel staff to operate the Boulevard Inn.

b.  On information and belief, each of the Boulevard Inn Defendants received financial benefits from operating the Boulevard Inn, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c.  By participating in a venture that facilitated sex trafficking, the Boulevard Inn Defendants also benefited by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Boulevard Inn specifically.

d.  This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of the hotel staff and the widespread sex trafficking at the Boulevard Inn.

e.  Despite their actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Boulevard Inn Defendants participated in the venture by continuing to associate with Franchisee Defendant to operate the Boulevard Inn in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (G.N.C.).

f.  Jane Doe (G.N.C.)'s trafficking at the Boulevard Inn was a result the Boulevard Inn Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Boulevard Inn. Had each Boulevard Inn Defendant not

continued participating in a venture that each knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the defendant would not have received a benefit from Jane Doe (G.N.C.)'s trafficking at the Boulevard Inn.

198.    Upon information and belief, the Boulevard Inn Defendants are corporate affiliates who shared officers, directors, and employees and who had a high degree of integration of operations operating the Boulevard Inn.

199.    Upon information and belief, the Boulevard Inn Defendants engaged in a joint venture operating the Boulevard Inn because they engaged in profit sharing, mutual control, and a high degree of interrelations of operations such that each of the Boulevard Inn Defendants is vicariously liable for each of the other Boulevard Inn Defendants.

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

200.    Jane Doe (G.N.C.) incorporates all other allegations.

**I.    Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (ES Franchisee Defendants, Hotel Pennsylvania Defendants, and Boulevard Inn Defendants)**

201.     Jane Doe (G.N.C.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

202.    The ES Franchisee Defendants, Hotel Pennsylvania Defendants, and Boulevard Inn Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because each of these Defendants:

    a.    Violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (G.N.C.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b. Violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel property.

203. Violations of 18 U.S.C §1595(a) by each of these Defendants as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (G.N.C.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

## II.    Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants)

204. Jane Doe (G.N.C.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

205. Through acts and omissions described throughout this Complaint, each of the Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe (G.N.C.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (G.N.C.)'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, each Defendant is liable as a beneficiary under 18 U.S.C §1595(a).

206. Through the acts and omissions described throughout this Complaint, each Defendant received a financial benefit from participating in a venture with other Defendants operating its respective hotel property despite the fact that each Defendant knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

207.    Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (G.N.C.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

### III.    Vicarious Liability for TVPRA Violations (ES Brand Defendant, Hotel Pennsylvania Defendants, and Boulevard Inn Defendants)

208.    The ES Franchisee Defendants acted as the actual agents of the ES Brand Defendant when operating the Embassy Suites Buffalo.

209.    Through the acts and omissions described throughout this Complaint, the ES Brand Defendant exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate the Embassy Suites Buffalo.

210.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

211.    As alleged above, ES Franchisee Defendants are directly liable to Jane Doe (G.N.C.) for violations of the TVPRA, both as perpetrators under 18 U.S.C §1591(a) and as beneficiaries under 18 U.S.C §1595(a). The ES Brand Defendant are vicariously liable to Jane Doe (G.N.C.) for those same violations.

212.    Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

213.    Under the TVPRA and the federal common law, an entity vicariously liable for the acts and omissions of its alter-egos.

214.    On information and belief, each of the ES Brand Defendant participated in a joint venture franchising and operating the Embassy Suites Buffalo. These Defendants had highly integrated operations, shared revenue and profits generated from the hotel, and exercised mutual

control over the venture at the hotel. They functioned as a single integrated entity and/or as alter-egos of one another.

215. On information and belief, each of the Hotel Pennsylvania Defendants participated in a joint venture operating the Hotel Pennsylvania. They had highly integrated operations at the hotel, shared revenue and profits generated from the hotel, and exercised mutual control over the venture at the hotel. They functioned as a single integrated entity and/or as alter-egos of one another.

216. On information and belief, each of the Boulevard Inn Defendants participated in a joint venture operating the Boulevard Inn. They had highly integrated operations at the hotel, shared revenue and profits generated from the hotel, and exercised mutual control over the venture at the hotel. They functioned as a single integrated entity and/or as alter-egos of one another.

217. Each of the ES Brand Defendant is vicariously liable for the TVPRA violations of each of the other ES Brand Defendants.

218. Each of the Hotel Pennsylvania Defendants is vicariously liable for the TVPRA violations of each of the other Hotel Pennsylvania Defendants.

219. Each of the Boulevard Inn Defendants is vicariously liable for the TVPRA violations of each of the other Boulevard Inn Defendants.

## DAMAGES

220. The Defendants' acts and omissions, individually and collectively, caused JANE DOE (G.N.C.) to sustain legal damages.

221. Defendants are joint and severally liable for all past and future damages sustained by JANE DOE (G.N.C.).

222.    JANE DOE (G.N.C.) is entitled to be compensated for personal injuries and economic damages, including:

     a.  Actual damages (until trial and in the future)

     b.  Direct damages (until trial and in the future)

     c.  Incidental and consequential damages (until trial and in the future)

     d.  Mental anguish and emotional distress damages (until trial and in the future)

     e.  Lost earnings and lost earning capacity (until trial and in the future)

     f.  Necessary medical expenses (until trial and in the future)

     g.  Life care expenses (until trial and in the future)

     h.  Physical pain and suffering (until trial and in the future)

     i.  Physical impairment (until trial and in the future)

     j.  Unjust enrichment (until trial and in the future)

     k.  Exemplary/Punitive damages.

     l.  Attorneys' fees

     m. Costs of this action

     n.  Pre-judgment and all other interest recoverable

## JURY TRIAL

223.    JANE DOE (G.N.C.) demands a jury trial on all issues.

## RELIEF SOUGHT

224.    WHEREFORE, JANE DOE (G.N.C.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for JANE DOE (G.N.C.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit,

prejudgment interest, post-judgment interest, and such other and further relief to which JANE DOE

(G.N.C.) may, in law or in equity, show herself to be justly entitled.

Dated: New York, New York
      January 22, 2024                        Respectfully Submitted,

                                              **LOCKS LAW FIRM PLLC**

                                              By:*/s/Anthony P. Mastroianni*
                                              Anthony P. Mastroianni, Esq.
                                              622 Third Avenue, 7th Floor
                                              New York, New York 10017
                                              Tel: (212) 838-3333
                                              Fax: (212) 838-3735
                                              Email: amastroianni@lockslaw.com

                                              **PROVOST  UMPHREY LAW FIRM, L.L.P.**

                                              */s/Matthew Matheny*
                                              Matthew Matheny
                                              mmatheny@pulf.com
                                              Bryan O. Blevins
                                              BBlevins@pulf.com
                                              Christopher T. Kirchmer
                                              CKirchmer@pulf.com
                                              Fabiana Baum
                                              Fbaum@pulf.com
                                              350 Pine Street, Ste. 1100
                                              Beaumont, TX 77701
                                              Phone: (409) 835-6000
                                              Fax: (409) 838-8888

                                              **ANNIE MCADAMS, PC**

                                              */s/Annie McAdams*
                                              Annie McAdams
                                              1150 Bissonnet
                                              Houston, TX 77005
                                              Phone: 713-785-6262
                                              Fax: 866-713-6141
                                              annie@mcadamspc.com

                                              *Attorneys for Plaintiff*

To:    *See attached Service Rider*

**Service Rider**
**Jane Doe (G.N.C.) v. Uniquest Hospitality LLC, et al.**

**Uniquest Hospitality, LLC**
100 Corporate Parkway, Suite 500
Amherst, NY 14226

**Brookwood Hospitality, LLC**
The LLC
57 Brook Court
East Amherst, NY 14051

**Hilton Franchise Holding LLC**
7930 Jones Branch Drive, Suite 1100
McLean, Virginia 22102

Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**Vornado Realty Trust**
888 Seventh Avenue
New York, NY 10019

The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, MD 21093

**Vornado Realty L.P.**
888 Seventh Avenue
New York, NY 10019

C T Corporation System
28 Liberty Street
New York, NY 10005

**401 Hotel TRS, LLC**
401 Seventh Avenue
New York, NY 10001

C T Corporation System
28 Liberty Street
New York, NY 10005

**Jai Bhole, Inc.**
9 Ryan Place
Fredonia, NY 14063

The Corporation
785 Niagara Falls Blvd.
Amherst, NY 14226

**Rudra MGMT Inc.**
51 Anderson Road
Cheektowaga, NY 14225